## In re TRANSKARYOTIC THERAPIES, INC.

### Consolidated Civil Action No. 2776–CC.

Court of Chancery of Delaware.

Submitted: April 22, 2008.
Decided: June 19, 2008.
Revised: June 24, 2008.

---

Arthur L. Dent, Bradley W. Voss, and Abigail M. LeGrow, of Potter, Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Plaintiffs Millenco LLC, Porter Orlin LLC, and Atticus Capital LP.

Stephen E. Jenkins, Steven T. Margolin, Lauren E. Maguire, Catherine A. Strickler, and Andrew D. Cordo, of Ashby & Geddes, P.A., Wilmington, Delaware, Attorneys for Plaintiffs Icahn Partners Master Fund, L.P., Icahn Partners, L.P., High River Limited Partnership, CR Intrinsic Investments, LLC, Sigma Capital Associates, LLC, Viking Global Equities LP, and VGE III Portfolio, Ltd.

Allen M. Terrell, Jr., John D. Hendershot, Charles A. McCauley III, and Meredith M. Stewart, of Richards, Layton & Finger, Wilmington, Delaware; of Counsel: Dennis E. Glazer, Kimberley D. Harris, Andrew R. Polland, and Edward N. Moss, of Davis Polk & Wardwell, New York, New York, Attorneys for Defendants Transkaryotic Therapies, Inc. and Shire plc.

J. Travis Laster and Matthew F. Davis, of Abrams & Laster LLP, Wilmington, Delaware; of Counsel: Robert H. Baron and Gary A. Bornstein, of Cravath, Swaine & Moore LLP, New York, New York, Attorneys for Defendants Jonathan S. Leff and Rodman W. Moorhead, III.

Henry E. Gallagher, Jr., Kevin F. Brady, Christos T. Adampoulos, and Ryan P. Newell, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware, Attorneys for Defendant Wayne P. Yetter.

Daniel V. Folt and Matt Neiderman, of Duane Morris LLP, Wilmington, Delaware, Attorneys for Defendant Dennis H. Langer.

## *OPINION*

CHANDLER, Chancellor.

All corporate combinations leave in their wake certain artifacts—documents, e-mails, conversations, and notes. If one digs through enough of the rubble of a consummated merger, one will almost invariably find something questionable. A clever corporate archeologist can extrapolate from these suspicious artifacts and concoct a theory of malfeasance, disloyalty, and bad faith. Yet, theories alone cannot lead to liability. To survive a motion for summary judgment, such excavating plaintiffs must provide the Court with solid evidence of a genuine issue of material fact; they cannot rely on their allegations. Similarly, to be awarded summary judgment, defendants must demonstrate that there is no triable issue of fact; defendants cannot rely on rebuttable presumptions once plaintiffs have rebutted them.

The merger of Transkaryotic Therapies ("Transkaryotic," "TKT," or the "Company") and Shire Pharmaceuticals Group plc ("Shire"), which occurred nearly three years ago, has certainly left a cumbersome, voluminous record of artifacts. This case, originally filed in the summer of 2005, began as an action for appraisal un-

der 8 *Del. C.* § 262,[1] but has grown to now encompass numerous alleged breaches of fiduciary duty, a charge of aiding and abetting those breaches, and a claim of unlawful merger. Presently pending before the Court is a series of motions for summary judgment filed by defendants on the non-appraisal claims. Specifically, former TKT directors Wayne P. Yetter, Rodman W. Moorhead, III, and Jonathan S. Leff (the "Individual Defendants") have moved for summary judgment on plaintiffs' claims that they breached their duties of loyalty and disclosure.[2] Yetter, Shire, and Transkaryotic have moved for summary judgment on the disclosure claims and unlawful merger claim. Finally, Shire has moved for summary judgment on the claim that it aided and abetted the alleged breaches of duty by the other defendants.

For the reasons explained fully below, I have largely granted defendants' motions. First, I grant summary judgment in favor of defendants on Count I, the alleged breaches of the duty of disclosure. Over three years have passed since the Company solicited proxies from its shareholders in favor of the merger, and it is now too late for the Court to remedy any disclosure violations. Second, I grant summary judgment in favor of the Individual Defendants on Count II, the alleged breaches of the duty of loyalty. Plaintiffs have failed to put forth evidence of a genuine issue of fact with respect to the defendants' loyalties; enthusiasm for a merger and engagement in the merger negotiations do not equate with disloyalty or bad faith. Third, I largely grant summary judgment in fa-

vor of Shire on Count IV, the charges of aiding and abetting, because of my conclusions with respect to Count II. However, plaintiffs have put forth enough evidence to survive summary judgment on Count IV with respect to Shire's alleged aiding and abetting of Langer's alleged breach of fiduciary duty. Finally, I deny summary judgment with respect to Count III, the unlawful merger claim, because the plaintiffs have demonstrated a material issue of fact regarding it. I explain the rationale for these decisions after a summary of the pertinent facts.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The story of this case lives in the events leading up to, and including, the ultimate consummation of a merger between Transkaryotic Therapies and Shire Pharmaceuticals Group—a merger that was completed on July 27, 2005. It is a story about a clash between directors and the CEO of TKT, about the influence of private equity investors on the board, and about the sometimes muddled line between principled diligence and overeager disloyalty.[3]

### A. The Characters

#### 1. Transkaryotic

Headquartered in Cambridge, Massachusetts, Transkaryotic was a biopharmaceutical company focused on researching, developing, and commercializing treatments for rare diseases caused by protein deficiencies. Products used to treat rare

---

1. *See In re Appraisal of Transkaryotic Therapies, Inc.,* C.A. No. 1554 (original petition filed Aug. 10, 2005).

2. Defendant Dennis Langer has not moved for summary judgment on the loyalty and disclosure claims against him, but he has joined Yetter's brief with respect to Count III.

3. The facts discussed in this section come from the record evidence submitted in connection with briefing on the motions for summary judgment. This section provides only an overview. More detailed facts and citations to the record are contained and discussed in the analyses of the various claims below.

diseases are known as "orphan drugs," and the United States and Europe encourage their development by offering long periods of marketing exclusivity in order to prevent drug companies from ignoring ailments that affect relatively few people. Orphan drugs generally command extraordinarily high prices, and they were a primary focus of the Company's business strategy.

In 2002, Transkaryotic's stock was trading in the $30 to $40 range, and the Company was on the verge of obtaining approval and orphan drug status for Replagal, a drug designed to treat Fabry disease. However, Transkaryotic erred during the FDA approval process by unlocking the clinical data too early, and then-CEO Richard Seldon made public statements about the gaffe that led to an SEC investigation and shareholder litigation. A competitor's product beat TKT's drug to orphan status in the United States. Despite Replagal's eventual commercial success outside the United States, Transkaryotic's stock plummeted to less than $5 per share by early 2003.

New management was brought in, and Michael Astrue replaced Seldon as CEO. By the summer of 2004, TKT's stock price had climbed back to the mid-teens, and the Company had promising drugs in development. That fall, the Company began merger discussions with Shire.

### 2. Shire

Shire is another pharmaceutical company, which is far more diversified than TKT. Its business model was based primarily on growth through the acquisition of other companies and their products rather than through internal development. In July 2004, Goldman Sachs, Shire's investment banker, presented a report on potential targets that included an analysis of Transkaryotic. Goldman Sachs present-

ed a more detailed report on TKT in September 2004, and, later that fall, Shire contacted TKT about as possible merger.

### 3. Warburg Pincus LLC

Warburg Pincus LLC ("Warburg") is a private equity firm that manages billions of dollars in investments. Warburg was a founding investor in Transkaryotic, and a Warburg professional named Rodman Moorhead played a very significant role in the process. Ultimately, Warburg became the Company's largest single investor, holding over 14% of the equity. This large stake entitled Warburg to a director on the Company's board. At the time of the merger that seat was held by Jonathan Leff. Moorhead also served on the TKT board, although he was not an official designee of Warburg at the time of the merger. When Transkaryotic's stock price fell dramatically in early 2003, Warburg lost over $100 million. In 2004, Warburg considered its TKT investment problematic.

### 4. Michael J. Astrue

Michael Astrue became the CEO of Transkaryotic after Seldon stepped down following the Replagal incident. Astrue had originally joined Transkaryotic in 2000 as general counsel, but resigned in 2002 in part out of concern over Seldon's management of the Company. He was asked to rejoin as CEO in 2003. As noted, TKT's stock recovered much ground under Astrue's leadership. As explained below, Astrue became a vocal critic of the deal with Shire and led the charge to stop it from happening.

### 5. Wayne P. Yetter

Wayne Yetter has a nearly forty-year career in the pharmaceutical industry during which he has served as an executive and director for many companies. In November 1999 he joined the TKT board, and

he was appointed chairperson of that board in April 2004. Shire's initial expression of interest in TKT was made by its CEO, Matthew Emmens, to Yetter in October 2004.

Yetter and Emmens had a prior relationship. Emmens first worked for Yetter at Merck for about two years in the mid–1980s. Several years later, after Yetter had moved to a position with Astra Merck, he again hired Emmens. The two worked together at Astra from 1992 to 1997, when Yetter left to become CEO of Novartis Pharmaceuticals. They did not work for the same company again. Although he held positions on several boards,[4] Yetter was looking for a new primary job when Shire first approached TKT, and his résumé listed Emmens as one of his references.

### 6. Jonathan S. Leff

Jonathan Leff was Warburg's official representative on the Transkaryotic board. He was appointed in June 2000. In 2001, Leff recommended that Warburg increase its stake in TKT, and he was greatly disappointed by the Replagal incident. By 2004, Leff had begun recommending that Warburg consider selling shares if the price of the stock climbed to the high teens. As detailed below, after discussions with Shire began, Leff became a vocal proponent of the merger and he clashed with Astrue.

### 7. Rodman W. Moorhead, III

A senior investment professional with Warburg, Rodman Moorhead was one of the founders of Transkaryotic, served as its chairperson for fifteen years, and sat on the Company's board throughout its existence. In addition to his role in TKT as a

result of his association with Warburg, Moorhead personally owned almost 55,000 shares of the Company. In 2000, Moorhead started to wind down his career at Warburg, but he nevertheless continued to serve on the TKT board. He remained on the board through the merger discussions with Shire, and ultimately voted in favor of the merger.

### 8. Dennis Langer

Dennis Langer, who has not moved for summary judgment on the fiduciary duty claims filed against him by plaintiffs, was a director of Transkaryotic who voted in favor of the merger. He was named to the board in late 2003 and, outside his work on the TKT board, held a position with Dr. Reddy's Laboratories ("Dr. Reddy's"). Soon after joining the board, Langer began working to develop a potential joint venture between Transkaryotic and Dr. Reddy's to commercialize certain proteins that TKT sought to license.

Specifically, Langer envisioned the formation of a new entity, to be named "Zuma," that would develop and market the compounds acquired from Transkaryotic. Zuma would become a joint venture, owned largely by a third-party investor, as well as by TKT and Dr. Reddy's. Transkaryotic would receive an equity position in Zuma in addition to receiving certain payments, and Langer would become a director of Zuma and receive stock and options in Zuma that had a potential value of up to $8 million. Langer was trying to negotiate this so-called "Zuma Transaction" when Shire approached Transkaryotic.

### B. The Initial Approach and Reaction

In the fall of 2004, Transkaryotic's stock price remained far below its former highs

---

**4.** One of the boards on which Yetter served was that of Noven Pharmaceuticals, Inc. Noven had a contractual relationship with Shire under which Shire purchased sales and marketing rights to various Noven products.

as a result of the Replagal issue, but the Company was poised to improve. Goldman Sachs recognized TKT's potential and recommended it as a target to Shire. Emmens agreed and, because he had a preexisting relationship with Yetter, placed a confidential call to Yetter in early October 2004 to express Shire's initial interest.[5] This October call was not disclosed to the entire TKT board or to the TKT shareholders.

On November 15, 2004, Shire made its official expression of interest in a merger. Yetter alerted Astrue and Leff, and they agreed to retain SG Cowen as a financial advisor on November 19. Five days later, Yetter, then the chairperson of the TKT board, organized a teleconference to alert the other directors to Shire's interest, but he did not then disclose his prior relationship with Emmens. Yetter explained that Shire wanted to move quickly and close the deal promptly. He also expressed his tentative support for the acquisition. Likewise, Leff and Moorhead were enthusiastic. The other four directors, however, expressed concerns about the lack of a formal offer from Shire and about the speed with which Shire was trying to move. Astrue, in particular, apparently expressed disdain for Shire, labeling the company unethical and stating that it was a "bottom feeder" that did not conduct its own research.

## C. The Formal Offer and Reaction

In early December 2004, Shire made a formal offer to buy Transkaryotic for $29–$31 per share. Yetter was not satisfied with this price, but believed the board should move forward to see if a transaction could happen. Leff and Moorhead agreed. Astrue, however, strongly disagreed, and expressed his concerns for what would be-

come of the Transkaryotic employees if Shire purchased the Company. Nevertheless, the TKT board authorized SG Cowen to invite Shire to conduct limited due diligence on legal and financial matters.

Yetter and Leff were concerned that Astrue was betraying his fiduciary responsibilities by considering the employees over the shareholders and by acting with animus against Shire in particular. Leff accused Astrue of trying to entrench himself, and Leff and Yetter—the members of the nominating committee—threatened to withhold the renomination of Astrue to the board.

## D. Shakeup on the TKT Board

On January 7, 2005, Astrue called Yetter and emotionally complained that the board was not taking his concerns seriously. He also accused Yetter of improper motives for pushing for the Shire deal, implying that Yetter stood to benefit somehow from the deal in a way that the others and the shareholders would not. Meanwhile, Shire was growing impatient with Astrue and, on January 14, Emmens once again reached out to Yetter to ask about the status of negotiations. Yetter disclosed this contact to Astrue and Leff.

The next day, Astrue told Leff that he was sure Yetter was acting with improper motives. He stated that Yetter was pushing for the Shire deal in order to secure consulting work or a full-time position with Shire. Astrue expressed similar concerns to another board member, Dr. Lydia Villa–Komaroff. When asked by Leff to explain the basis of his beliefs, Astrue simply stated that Yetter seemed too eager to complete a deal with Shire.

At the board meeting on January 17, 2005, Astrue expressed his concerns to the

---

**5.** Emmens and Yetter cannot recall this conversation, but it is adequately supported by contemporary notes and by e-mail messages from Leff.

entire board. Yetter denied that he had any improper motivation and disclosed that he had a preexisting relationship with Emmens, but he did not disclose the initial October call from Emmens and did not disclose that he listed Emmens as a reference on his résumé. Astrue stepped out of the meeting so the others could consider how to respond. When he returned, the board reprimanded him for making unfounded and unsubstantiated claims about Yetter's motives. Astrue learned that Yetter had stepped down; the board expressed that its confidence had been shaken in Yetter, and Yetter believed that his relationship with the CEO was fractured. Dr. Villa–Komaroff assumed the position as chairperson of the board.

In addition to reprimands from the board, Astrue received less than favorable reviews from others involved in the process. In February 2005, he accosted Emmens and vowed, "[Y]ou're not going to get this company. And if you do, you're going to pay so much you're going to look like a fool." [6] James Katzman, who led the Goldman Sachs team advising Shire, testified that during meetings Astrue was "beyond obstructionist . . . extraordinarily obnoxious . . . rude, dismissive, antagonistic, unhelpful. I've actually never dealt with someone who was that rude in that type of format before or subsequently." [7] SG Cowen employees expressed similar concerns.

On February 23, 2005 Shire wrote to formally offer to purchase Transkaryotic for $31 per share based on the due diligence it was able to conduct. On February 26, 2005 the TKT board met to discuss the offer. A resolution was introduced to formally reject the offer as too low. That resolution passed, with Leff and Moorhead dissenting. The board authorized SG Cowen to advise Shire that its offer would need to be increased significantly if negotiations were to proceed.

### E. The Zuma Transaction

After the February meeting, the board had reached an impasse. Although a clear majority thought the $31 per share price was too low, the board seemed to be split into two factions: one in favor of a deal with Shire at a higher price, and one disinclined to do a deal at all. Langer was initially part of the latter group. The plaintiffs allege that Langer agreed to support the Shire deal in return for assurances that the Zuma Transaction would be a part of the package.

By early March 2005, discussions surrounding the Zuma Transaction had stalled. Leff was ambivalent at best about it, and Astrue, in an e-mail sent on March 4, acknowledged that the Zuma Transaction seemed dead in the water. Leff, in his capacity with Warburg, had a trip scheduled in March to visit India in order to discuss a possible investment in Langer's other employer, Dr. Reddy's. Plaintiffs contend that Langer changed his plans in order to travel with Leff so he could strike a deal with Leff over the Zuma Transaction and the Shire deal. Plaintiffs argue that Leff changed his position on Zuma sometime after this trip and that SG Cowen began, in late March, to lobby Shire to approve the Zuma Transaction as a part of any deal with TKT. Langer was apparently led to believe that Emmens had agreed to the Zuma Transaction during the TKT–Shire negotiations and before the board's final approval of the merger.

**6.** Nov. 2, 2006 Dep. of Matthew Emmens at 66 [hereinafter "Emmens Dep."].

**7.** Nov. 30, 2006 Dep. of James Katzman at 57–61, 64–66.

### F. The Board Approves the Merger

By late March, the TKT board had reached a consensus that an appropriate price for the company was in the $36–$37 range. Astrue, however, wanted to delay any possible deal until after the Company had released the phase III testing results for the I2S program because he believed that they might drive up the stock price. Leff and Yetter opposed this course of action; both were concerned about a possible repeat of the Replagal debacle.

On March 31, 2005, Dr. Cavanaugh, the chairperson of the Shire board, wrote to Dr. Villa–Komaroff to notify her that Shire was interested in making an offer at $37 per share. Shire's board authorized its management to proceed with this offer on April 16, 2005. On April 21, 2005, the TKT board approved the merger by a vote of five to two,[8] and Astrue resigned in protest.

### G. Post–Approval Developments

Despite the board's formal approval, the merger could not be completed without the affirmative vote of the Transkaryotic shareholders. In preparation for the shareholder meeting, the Company had to prepare its proxy statement and make material disclosures to its shareholders. Plaintiffs complain that TKT failed to disclose the relationship or communications between Yetter and Emmens, the possibility of the Zuma Transaction or Langer's interest in it, and the potential conflicts of its bankers.

The record date for the merger was June 10, 2005. Just ten days after that, however, the phase III I2S test results were revealed, and they were extraordinarily positive. Both Shire and TKT instructed their financial advisers to prepare a new forecast, and both realized that the proxy statement would need to be revised. Plaintiffs argue that the momentous results eliminated the "shared risk" that justified the merger price; these results clearly demonstrate, they say, that TKT was worth more than $37 per share. Both Langer and Dr. Villa–Komaroff expressed some belief that a new market check should be performed after the release of the results, but none was completed. At the same time, though the I2S results were public, no other bidder ever emerged.

In anticipation of the actual shareholder vote, Leff took the lead in promoting the merger. He played a major role in drafting and revising the proxy statement and with respect to meetings and presentations with Institutional Shareholder Services (ISS). On behalf of the board, Leff reached out to record shareholders to explain the board's rationale for supporting the merger, and his efforts proved fruitful.

### H. The Shareholder Vote

On July 27, 2005 a majority of TKT's shareholders approved the merger. The vote was close, however, with the merger passing by less than one million votes. The results were certified by the inspector of elections and a certificate of merger was filed with the Delaware Secretary of State. No shareholder challenged the validity of the merger at the time and no action was ever filed pursuant to 8 *Del. C.* § 225(b). Nevertheless, plaintiffs argue that the evidence obtained in discovery demonstrates that the results were incorrectly tabulated and question whether the merger was legally effected.

### I. Procedural History

Plaintiffs filed appraisal actions between August and November 2005. A year and a

---

8. Contrary to plaintiffs' suggestion, it fairly appears from the record that only one formal vote was taken and that its result was approval of the merger by five to two.

half later, after discovery in the appraisal actions, plaintiffs filed the instant fiduciary duty action on March 8, 2007. The actions were consolidated by this Court on August 6, 2007. Briefing on the pending motions for summary judgment was completed on March 7, 2008 and the Court heard oral argument on April 15, 2008.

## II. STANDARDS FOR SUMMARY JUDGMENT

Rule 56 provides for summary judgment where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[9] The burden, of course, is on the moving party,[10] and the Court views the evidence in the light most favorable to the nonmovant.[11] However, once the moving party has satisfied its initial burden of "demonstrating the absence of a material factual dispute,"[12] the burden shifts to the nonmovant to present some specific, admissible

evidence that there is a genuine issue of fact for a trial.[13] Indeed, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading."[14] If both sides put forth conflicting evidence such that there is an issue of material fact, summary judgment must be denied; "the function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight."[15]

## III. DISCLOSURE

In Count I of their complaint, plaintiffs contend that the Individual Defendants breached their fiduciary duties by failing to disclose or by misrepresenting material facts to shareholders of Transkaryotic before the shareholder vote in July 2005. This claim is based on a board's fiduciary responsibility "to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[16] This Court has adopted the federal standard for materiality.[17]

9. Ct. Ch. R. 56(c).

10. *Whittington v. Dragon Group, L.L.C.*, C.A. No. 2291–VCP, 2008 WL 2316305, at *3 (Del. Ch. June 6, 2008).

11. *Levy v. HLI Operating Co.*, 924 A.2d 210, 219 (Del.Ch.2007).

12. *Id.*

13. *Del–Chapel Assocs. v. Conectiv*, C.A. No. 19498–VCL, 2008 WL 1934503, at *3 (Del.Ch. May 5, 2008); *see also United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 829 (Del. Ch.2007) ("A trial is merely a vehicle for the act of fact finding. To the extent this Court needs to resolve a legal question alone, no trial is necessary. Summary judgment under Rule 56 allows resolution of a legal issue without the 'delay and expense of a trial.' ").

14. Ct. Ch. R. 56(e).

15. *Continental Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del.1969); *see also Healy v. Healy*, C.A. No. 19816–NC, 2006 WL 3289623, at *2 (Del.Ch. Oct. 31, 2006) ("A

motion for summary judgment does not allow the Court to weigh the evidence."); *Izquierdo v. Sills*, C.A. No. 15505–NC, 2004 WL 2290811, at *2 (Del.Ch. June 29, 2004) ("Importantly, in ruling on a motion for summary judgment, a judge should not weigh evidence and accept the argument perceived to be of greater weight. On a motion for summary judgment, judges may only determine whether or not there is a genuine issue as to a material fact; they may not try that issue.").

16. *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992); *see also* Jack B. Jacobs, *The Fiduciary Duty of Disclosure after Dabit*, 2 J. BUS. & TECH. L. 391, 395 (2007) ("A classic, although perhaps not complete, definition of the fiduciary duty of disclosure under Delaware law is that corporate directors are required to disclose all material information within their control when they seek shareholder action.").

17. *See, e.g., Berger v. Pubco Corp.*, C.A. No. 3414–CC, 2008 WL 2224107, at *2 (Del.Ch. May 30, 2008) (quoting the materiality standard from *TSC Indus., Inc. v. Northway, Inc.*,

Specifically, plaintiffs argue that defendants failed to disclose material facts about Warburg's influence on Leff and Moorhead, the relationship between Yetter and Emmens, the existence and circumstances of the Zuma Transaction, the existence of an additional valuation prepared by Chestnut Partners, adjustments made to management forecasts by Bank of America in its report, the fact that three directors opposed the merger, and facts relating to conflicts and failings of the TKT financial advisors. Defendants reply that plaintiffs' claims are barred by Transkaryotic's § 102(b)(7) exculpatory provision or are mere recapitulations of "plaintiffs' substantive allegations of wrongdoing" that need not be disclosed because directors need not "engage in self-flagellation."[18] This Court, however, need not determine whether the purported facts are material,

whether defendants are protected by the exculpatory provision, or whether such disclosure would have amounted to "self-flagellation," because all of plaintiffs' disclosure claims are barred.

■ The fiduciary duty of disclosure is somewhat nebulous. Although usually labeled and described as a duty,[19] the obligation to disclose all material facts fairly when seeking shareholder action is merely a specific application of the duties of care and loyalty.[20] That it is an application of well established duties—rather than an independent duty itself-however, does not render this area of the law clear. Corporate transactional attorneys worry when constructing deals about what disclosures the so-called duty requires above and beyond federal law.[21] Corporate litigators worry about what liability may arise from a failure to fairly make all disclosures.[22]

---

426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

**18.** *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 736 (Del.Ch.1999).

**19.** *See, e.g., In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766 (Del.2006) (repeatedly mentioning the "fiduciary duty of disclosure"); Jacobs, *supra* note 16 (describing "the fiduciary duty of disclosure").

**20.** *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del.2001) ("We begin by observing that the board's fiduciary duty of disclosure, like the board's duties under Revlon and its progeny, is not an independent duty but the application in a specific context of the board's fiduciary duties of care, good faith, and loyalty."); *Skeen v. Jo–Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del.2000) ("Directors of Delaware corporations are fiduciaries who owe duties of due care, good faith and loyalty to the company and its stockholders. The duty of disclosure is a specific formulation of those general duties that applies when the corporation is seeking stockholder action."); *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 745 n. 400 (Del.Ch.2005) ("The Delaware Supreme Court has been clear that outside the recog-

nized fiduciary duties of care and loyalty (and perhaps good faith), there are not other fiduciary duties. In certain circumstances, however, specific applications of the duties of care and loyalty are called for, such as so-called 'Revlon' duties and the duty of candor or disclosure."); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 157 (Del.Ch.2004) (referring to duty of disclosure "as a species of the fiduciary duty of loyalty"); *see also Berger*, 2008 WL 2224107, at *2 ("The so-called 'duty of disclosure' is not quite 'a separate and distinct fiduciary duty' "); *In re CheckFree Corp. S'holders Litig.*, C.A. No. 3193–CC, 2007 WL 3262188, at *2 (Del.Ch. Nov. 1, 2007) ("This 'duty of disclosure' is not a separate and distinct fiduciary duty, but it clearly does impose requirements on a corporation's board").

**21.** *See, e.g.,* Eric S. Wilensky, Angela L. Priest, Amy Simmerman, and Bradley Sorrells, *2007 Developments in Delaware Corporation Law*, 40 Sec. Reg. & L. Rep. (BNA) No. 19, at 12–14 (May 12, 2008) (noting uncertainty in potential disclosure of management projections).

**22.** A review of treatises and scholarly commentary illustrates the uncertainty with re-

That latter worry stems in part from the evolution and development of the duty of disclosure.

The duty of disclosure—sometimes referred to as the duty of candor[23]—was originally most frequently discussed in connection with the duty of loyalty.[24] In *Lynch v. Vickers Energy Corp.*,[25] for example, the Supreme Court found a disclosure violation where a controlling shareholder failed to disclose material inside information when making a tender offer for the stock owned by the minority public shareholders. The withheld information indicated that the stock being tendered was worth more than the $12 per share the controlling shareholder was offering.[26] As a result, "the majority stockholder parent was liable for the resulting damages, measured by the difference between the adjudicated fair value of the shares and the tender offer price."[27] Somewhat simi-

larly, in *Weinberger v. UOP, Inc.*,[28] the Supreme Court found, among other things, a violation of the disclosure duty where two "inside directors" of a subsidiary corporation being merged into its parent obtained information about the value of their shares by virtue of their positions as directors, and they shared this information with the parent corporation but with neither their fellow directors nor the other shareholders of the subsidiary. Damages were awarded.[29] In both of these cases, and in other early cases, the court awarded damages on account of breaches of the directors' duty of candor *and* their duty of loyalty.[30]

Before long, however, the Supreme Court announced that a breach of the duty of disclosure could occur independent of a breach of the duty of loyalty. In *Smith v. Van Gorkom*,[31] for example, the Supreme Court held that plaintiffs were entitled to

---

spect to the nature of liability for breaches of the duty of disclosure. *See, e.g.*, 2 HAROLD S. BLOOMENTHAL SECURITIES LAW HANDBOOK § 38:50 (West 2007) (discussing evolution of remedies for breach of duty of disclosure); 2 EDWARD P. WELCH, ANDREW TUREZYN, AND ROBERT S. SAUNDERS, FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 327.2.1.6 (5th ed. 2007–2 Supp.) (describing uncertainty in damage awards for breaches of disclosure duty); 1 R. FRANKLIN BALOTTI AND JESSE A. FINKELSTEIN, THE DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 17.14 (3d ed.2006 Supp.) (noting that monetary damages may sometimes be appropriate for breaches of the disclosure duty where equitable relief is unavailable); DONALD J. WOLFE, JR. AND MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 12–10[b][2] (2007 Supp.) (describing the uncertainty of monetary damage for breaches of disclosure duty and noting that the courts have sometimes called such damages per se and other times expressed a policy that may "place a limit on the maxim that every wrong must have a correlative remedy"); Bernard Black et al., *Legal Liability of Directors and Company Officials Part I: Substantive Grounds for Liability (Report to the Russian Securities Agency)*, 2007 COLUM. BUS. L.REV. 614, 763 (2007) (describing U.S. law

and noting that "for violation of the duty decided cases").

23. *See, e.g.*, *Goodwin v. Live Entm't, Inc.*, C.A. No. 15765, 1999 WL 64265, at *12 (Del.Ch. Jan. 25, 1999) ("Disclosure claims have in the past sometimes been analyzed as 'duty of candor' claims.").

24. *See* Jacobs, *supra* note 16, at 396–97.

25. 383 A.2d 278 (Del.1977).

26. *Id.* at 280.

27. Jacobs, *supra* note 16, at 396.

28. 457 A.2d 701 (Del.1983).

29. *Id.* at 714.

30. *See* Jacobs, *supra* note 16, at 397; Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 VAND. L.REV. 1087, 1121–23 (1996) (noting that the disclosure duty was closely linked to the duty of loyalty in these early, formative years).

31. 488 A.2d 858 (Del.1985).

an award of damages due to the directors' breach of their duty of care *and* their duty of candor "by their failure to disclose all material information such as a reasonable stockholder would consider important in deciding whether to approve the Pritzker offer."[32] By the early 1990s, the Supreme Court fully endorsed "the notion that directors could be held liable in damages for having issued a public statement to stockholders that misrepresented or omitted a material fact, even in connection with a transaction in which they had no personal interest."[33]

Indeed, for a time, it seemed that a breach of the board's disclosure obligations automatically resulted in liability; directors could be forced to pay monetary damages for any breach, regardless of whether or not a shareholder plaintiff could prove negligence, scienter, or reliance.[34] *In re Tri–Star Pictures, Inc. Litigation*[35] goes so far as to suggest that Delaware's "law and policy have evolved into a virtual per se rule of damages for breach of the fiduciary duty of disclosure."[36]

Then, along came *Loudon v. Archer–Daniels–Midland Co.*[37] There, the Supreme Court retreated from its language in *Tri–Star*; breaches of the disclosure duty do not result in damages per se.[38] The law has evolved. Almost thirteen years ago, then-Vice Chancellor Jacobs commented that, in the context of an already completed merger, "disclosure claims might warrant rescission of the merger or (in cases where rescission is impractical and the circumstances otherwise warrant) a recovery of the monetary equivalent of rescission."[39] More recently, however, now-Justice Jacobs gave a far more nuanced treatment to the issue of damages for a breach of the duty of disclosure. In *In re J.P. Morgan Chase & Co. Shareholder Litigation*,[40] the Supreme Court began its analysis by recognizing that a claim for a breach of the duty of disclosure that "impaired the stockholder's right to cast an informed vote ... is direct."[41] The Court then proceeded to consider what damages might be awarded for such a direct claim, specifically considering compensatory and nominal damages. To be awarded the former, the Court held

**32.** *Id.* at 893.

**33.** Hamermesh, *supra* note 30, at 1137–38 (discussing the Supreme Court's holding in *Stroud v. Grace*, 606 A.2d 75 (Del.1992)).

**34.** *See id.* at 1093–95 ("In short, by a plausible, and arguably mandatory, reading of Delaware case law, a court may be obliged to require directors to pay damages on account of a failure to disclose what is determined in hindsight to have been a material fact in connection with a transaction in which the directors had no self-interest and acted with the utmost good faith and due care. Further *no stockholder could establish either reliance on the nondisclosure or damage resulting from the merger accomplished by means of the deficient proxy statement*.").

**35.** 634 A.2d 319 (Del.1993).

**36.** *Id.* at 333.

**37.** 700 A.2d 135 (Del.1997).

**38.** *Id.* at 141–42 (*"Tri–Star* stands only for the narrow proposition that, where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages."); *see also id.* at 146–47 ("We hold that under Delaware law there is no per se rule that would allow damages for all director breaches of the fiduciary duty of disclosure.").

**39.** *Nebel v. Sw. Bancorp, Inc.*, C.A. No. 13618, 1995 WL 405750, at *2 (Del.Ch. July 5, 1995).

**40.** 906 A.2d 766 (Del.2006).

**41.** *Id.* at 772.

that plaintiffs must prove that such damages are "logically and reasonably related to the harm or injury for which compensation is being awarded."[42] With respect to the latter, the Court reiterated its holding in *Loudon* that a breach of the duty of disclosure does not automatically result in a nominal damages award.[43]

It is now clear that some breaches of the disclosure duty result in no award of damages at all. For example, where a breach of the disclosure duty does not implicate bad faith or self-interest, both legal and equitable monetary remedies (such as rescissory damages) are barred on account of the exculpatory provision authorized by 8 *Del. C.* § 102(b)(7).[44] Furthermore, this Court has noted that there are some breaches of the disclosure duty that can be remedied by injunctive relief but not by monetary damages.[45]

The Court of Chancery's most recent decisions in the area of disclosure have made clear a desire to avoid entirely the issue of monetary damages and have expressed a "preference for having [disclosure claims] brought as [motions] for a preliminary injunction before the shareholder vote, as opposed to many months after."[46] As Vice Chancellor Strine noted:

Delaware case law recognizes that an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies. A posthoc evaluation will necessarily require the court to speculate about the effect that certain deficiencies may have had on a stockholder vote and to award some less-than-scientifically quantified amount of money damages to rectify any perceived harm. Therefore, our cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected. An injunctive remedy of that nature specifically vindicates the stockholder right at issue—the right to receive fair disclosure of the material facts necessary to cast a fully informed vote—in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.[47]

More importantly, this Court has explicitly held that a breach of the disclosure duty leads to *irreparable harm*.[48] On ac-

---

**42.** *Id.* at 773.

**43.** *Id.* at 775–76.

**44.** *See, e.g., Arnold v. Soc'y for Sav. Bancorp, Inc.*, C.A. No. 12883, 1995 WL 376919, at *1 (Del.Ch. June 15, 1995) (refusing to allow plaintiffs to pursue rescissory damages on remand because "[t]he Supreme Court's ruling prevents Plaintiff from recovering any damages from the Individual Defendants, whether based in law or equity."); *see also* 2 HAROLD S. BLOOMENTHAL, SECURITIES LAW HANDBOOK § 38:50 (West 2007).

**45.** *See, e.g., In re Triarc Cos.*, 791 A.2d 872, 877 (Del.Ch.2001); *see also* 3 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 860.50 (West 2007) (describing the holding in *Triarc* and noting that "violation of the directors' duty of disclosure did not support an award of money damages where the appropriate remedy would have been equitable").

**46.** *Globis Partners, L.P. v. Plumtree Software, Inc.*, C.A. No. 1577–VCP, 2007 WL 4292024, at *10 (Del.Ch. Nov. 30, 2007).

**47.** *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 (Del.Ch.2001) (footnotes omitted).

**48.** *E.g., Berger v. Pubco Corp.*, C.A. No. 3414–CC, 2008 WL 2224107, at *4 (Del.Ch. May 30, 2008) ("A disclosure violation results in an irreparable injury, which implicates the jurisdiction of this Court."); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 207 (Del.Ch.2007) ("[T]his court has typically found a threat of irreparable injury to exist when it appears stockholders may make an important voting decision on inadequate disclosures"); *Allen v. News Corp.*, C.A. No. 979–N, 2005 WL

count of this, the Court grants injunctive relief to prevent a vote from taking place where there is a credible threat that shareholders will be asked to vote without such complete and accurate information.[49] The corollary to this point, however, is that once this irreparable harm has occurred— *i.e.*, when shareholders *have* voted without complete and accurate information—it is, by definition, too late to remedy the harm.[50] If the Court could redress such an informational injury after the fact, then the harm, by definition, would not be irreparable, and injunctive relief would not be available in the first place.[51] The Su-

preme Court articulated this very tension over ten years ago in its *Loudon* decision when it noted that a disclosure violation cannot conceivably yield both legal and equitable relief.[52] Indeed, the defining characteristic of an irreparable injury is that the right being infringed has "some peculiar quality or use such that its pecuniary value, as estimated by a jury, will not fairly recompense the owner for the loss of it." [53] That is precisely the point Vice Chancellor Strine made in his *Staples* decision: the right to cast an informed vote is "peculiar" and specific and it cannot be adequately quantified or monetized.

415095, at \*1 (Del.Ch. Feb. 3, 2005) ("At this early stage, plaintiffs have demonstrated a 'sufficiently colorable claim' that the disclosures contained in News' proxy materials are materially deficient or misleading and that there is a 'possibility of a threatened irreparable injury,' namely the loss of the ability by the Fox shareholders to have all pertinent information available at the time they decide whether to tender their shares into the exchange offer, if expedition is not granted."); *In re MONY Group Inc. S'holder Litig.*, 852 A.2d 9, 18 (Del.Ch.2004) ("This disclosure violation threatens irreparable harm because stockholders may vote 'yes' on a transaction they otherwise would have voted 'no' on if they had access to full or nonmisleading disclosures regarding the CICs."); *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1262 (Del.Ch. 2003) ("The threat of an uninformed stockholder vote constitutes irreparable harm."); *In re Pure Resources, Inc. S'holders Litig.*, 808 A.2d 421, 452 (Del.Ch.2002) ("[I]rreparable injury is threatened when a stockholder might make a tender or voting decision on the basis of materially misleading or inadequate information.").

**49.** *See, e.g., MONY*, 852 A.2d at 18–19 (granting preliminary injunction on disclosure claim); *ODS*, 832 A.2d at 1262–63 (same).

**50.** *See In re Siliconix, Inc. S'holders Litig.*, C.A. No. 18700, 2001 WL 716787, at \*17 (Del.Ch. June 19, 2001); *Gilmartin v. Adobe Res. Corp.*, C.A. No. 12467, 1992 WL 71510, at \*13 (Del.Ch. Apr. 6, 1992) ("The right to cast an informed vote is specific, and its proper vindication in this case requires a specific

remedy such as an injunction, rather than a substitutionary remedy such as damages. To allow the merger to go forward would deprive the Preferred Stockholders of that right, whereas a preliminary injunction for a brief period to enable the defendants to make corrective disclosure is the remedy most likely to vindicate that right. Moreover, no other relief would be effective. The merger, if allowed to go forward, could not be undone, as it will involve the issuance of new Santa Fe securities that will be publicly traded on the national securities market." (citations omitted)); *Sonet v. Plum Creek Timber Co.*, C.A. No. 16931, 1999 WL 160174, at \*11 (Del.Ch. Mar. 18, 1999).

**51.** *See, e.g., Hollinger Int'l., Inc. v. Black*, 844 A.2d 1022, 1090 (Del.Ch.2004) ("Injury is irreparable when a later money damage award would involve speculation."), *aff'd*, 872 A.2d 559 (Del.2005); *see also* BLACK'S LAW DICTIONARY 789 (7th ed.1999) (defining "irreparable injury" as "[a]n injury that cannot be adequately measured or compensated by money").

**52.** *Loudon v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 141 (Del.1997) ("Injunctive relief in the form of corrective disclosures and resolicitation may be appropriate if the matter is addressed in time by a court of equity. It is difficult to see how damages may also be available in such a case." (footnotes omitted)).

**53.** 5 JOHN NORTON POMEROY, JR., POMEROY'S EQUITY JURISPRUDENCE AND EQUITABLE REMEDIES § 1909 (4th ed.1919).

■ The solicitation of proxies for the shareholder vote approving the merger of Shire and Transkaryotic occurred over three years ago. The merger has happened; "the metaphorical merger eggs have been scrambled." [54] An injunctive order requiring supplemental, corrective disclosures at this stage would be an exercise in futility and frivolity. Indeed, there are no longer shareholders of Transkaryotic from whom to solicit proxies. Because a disclosure violation results in irreparable harm and because this Court can no longer provide the equitable cure for such harm, I grant the Individual Defendants' motions for summary judgment with respect to the disclosure claims. I hold that this Court cannot grant monetary or injunctive relief for disclosure violations in connection with a proxy solicitation in favor of a merger three years after that merger has been consummated and where there is no evidence of a breach of the duty of loyalty or good faith by the directors who authorized the disclosures. [55]

■ Alternatively, I grant summary judgment in favor of defendants on these disclosure claims because damages are barred by TKT's exculpatory provision authorized under 8 *Del. C.* § 102(b)(7). As noted above and in previous decisions, not every breach of the duty of disclosure

---

**54.** *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del.Ch.2000) ("Under our case law, it is generally accepted that a completed merger cannot, as a practical matter, be unwound.").

**55.** One might also understand this holding as based on justiciability or standing. Delaware's Supreme Court has explicitly adopted the standing requirements set forth by the United States Supreme Court's holding in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *See Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110–11 (Del.2003). The three elements of standing are injury-in-fact, causation, and redressability. *Id.* The injury suffered by plaintiffs was an infringement of their right to cast informed votes on the merger. For the reasons articulated in this opinion, that injury is no longer redressable. Alternatively, to the extent plaintiffs can argue the alleged disclosure violations' injury was the illegal consummation of the merger, they lack standing for potentially two reasons. First, there is no evidence of causation; plaintiffs have pointed to nothing in the record indicating that the vote would have been different but for the allegedly bad disclosure. Plaintiffs merely speculate. Second, the injury cannot be redressed properly because the merger cannot be undone. *McMillan*, 768 A.2d at 500. Furthermore rescissory damages are exceptional, *see Strassburger v. Earley*, 752 A.2d 557, 579 (Del.Ch.2000), and are unwarranted here, where plaintiffs delayed filing their fiduciary action alleging breaches of the duty of disclosure and where, as discussed below, the Court concludes that the individual defendants have not breached their duty of loyalty and good faith. *Cf. Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 698 (Del.Ch. 1996) (refusing to award rescissory damages because of plaintiffs' delay in bringing action and because "an award of rescissory damages would be most appropriate where it is shown that the defendant fiduciaries unjustly enriched themselves by exercising their fiduciary authority deliberately to extract a personal financial benefit at the expense of the corporation's shareholders"). Indeed, it may be that no one has standing to bring disclosure claims after the consummation of a merger, but, as the United States Supreme Court has recognized, "[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *see also Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 489, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Schlesinger* and noting that "this view would convert standing into a requirement that must be observed only when satisfied"). Moreover, plaintiffs allege they have suffered this same injury in Count III, and there they argue the illegal consummation was caused by different conduct. *See* Section VI of this Opinion.

implicates bad faith or disloyalty.[56] Below, I have concluded that I must grant summary judgment in favor of the Individual Defendants on plaintiffs' claims of disloyalty and bad faith. Because plaintiff's disclosure claims are based on a failure to disclose behavior plaintiffs incorrectly label as disloyal,[57] any disclosure violation would implicate only the duty of care and would, therefore, not lead to the imposition of monetary damages.

## IV. LOYALTY

■ The board of directors manages or oversees the management of "[t]he business and affairs of every corporation organized under [Delaware law]."[58] From this axiomatic statement the business judgment rule is born.[59] That rule, of course, "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[60] When shareholders challenge the fairness of a merger's terms,

they must confront the business judgment rule. In this context, the rule tends to protect and insulate the board's decision to approve the terms of the merger. To successfully challenge the merger's terms at this stage, plaintiffs must rebut the presumptive protection of the business judgment rule.[61]

■ To do so, plaintiffs must show either (1) that a majority of the board suffers from a disabling interest or lack of independence[62] or (2) that " 'one or more directors less than a majority of those voting' " suffers from a material and disabling interest and that " 'the interested director controls or dominates the board as a whole or [that] the interested director fail[ed] to disclose his interest in the transaction to the board and a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction.' "[63] Thus, central to this exercise are the definitions of "interest" and "independence," whose meanings

---

**56.** See *Orman v. Cullman,* 794 A.2d 5, 41 (Del.Ch.2002) ("Furthermore, in *Arnold v. Society for Savings Bancorp, Inc.,* our Supreme Court held that a disclosure claim could be dismissed pursuant to a § 102(b)(7) exculpatory provision when the Court determined that there was no breach of the duty of loyalty and that the disclosure violation there was consistent with a good faith omission.").

**57.** See Section IV of this opinion.

**58.** 8 *Del. C.* § 141(a); *see also Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984) ("A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

**59.** *Orman v. Cullman,* 794 A.2d 5, 19 (Del.Ch. 2002).

**60.** *Aronson,* 473 A.2d at 812.

**61.** *E.g., Globis Partners, L.P. v. Plumtree Software, Inc.,* C.A. No. 1577–VCP, 2007 WL 4292024, at *4 (Del.Ch. Nov. 30, 2007); *State of Wis. Inv. Bd. v. Bartlett,* C.A. No. 17727, 2000 WL 238026, at *4 (Del.Ch. Feb. 24, 2000) ("In the context of a merger, a breach of fiduciary duty analysis begins with the rebuttable presumption that a board of directors acted with care, loyalty, and in 'good faith.' Unless this presumption is sufficiently rebutted, raising a reasonable doubt about self-interest or independence, the Court must defer to the discretion of the board and acknowledge that their decisions are entitled to the protection of the business judgment rule.").

**62.** See *Orman,* 794 A.2d at 22.

**63.** *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1168 (Del.1995) (quoting *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1153 (Del.Ch.1994)).

were extensively treated in the seminal *Aronson* decision. There, the Supreme Court defined interest to "mean that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." [64] In *Rales v. Blasband,* the Supreme Court noted that "[d]irectorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." [65] Importantly, the mere fact that a director received some benefit that was not shared generally by all shareholders is insufficient; the benefit must be material.[66]

Secondly, the *Aronson* Court held that "[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." [67] Here, plaintiffs allege that certain directors—specifically, Moorhead, Leff, Yetter, and Langer—made decisions based on such "extraneous considerations or influences" and that these directors were "conflicted in [their] loyalties with respect to challenged board actions." [68] Moorhead, Leff, and Yetter have moved for summary judgment on these loyalty claims; Langer

has not. I will address each of the movants in turn.

### A. *Moorhead*

■ There is no genuine issue of material fact with respect to Moorhead's loyalty. Therefore, his motion for summary judgment is granted. Plaintiffs' case against Moorhead is decidedly weak and consists of two points. First, plaintiffs argue that Moorhead breached his fiduciary duty of loyalty by "vot[ing] to accept" Shire's $31 per share offer in February 2005 when "[h]e was aware [that it] was not its 'full and final' offer." [69] Second, plaintiffs argue that Moorhead was simply Leff's "stooge" and that, "[i]n all things relating to TKT, Moorhead followed Leff's lead and supported Warburg." [70]

These arguments fail because neither is supported by facts in the record. Despite plaintiffs' contention, Moorhead never voted to "accept" Shire's $31 offer. Instead, he dissented from a board resolution formally rejecting that offer.[71] That fact alone cannot create a genuine issue of material fact with respect to Moorhead's loyalty. That fact is, however, the only Moorhead-specific argument plaintiffs can muster in their 110–page brief opposing summary judgment. Instead, plaintiffs contend that Moorhead impermissibly acted as Leff's "stooge," citing a single case for the proposition that such "stooge" di-

---

**64.** *Aronson,* 473 A.2d at 812.

**65.** 634 A.2d 927, 936 (Del.1993).

**66.** *Orman v. Cullman,* 794 A.2d 5, 23 (Del.Ch. 2002); *see also In re Gen. Motors Class H S'holders Litig.,* 734 A.2d 611, 617 (Del.Ch. 1999) (defining materiality to mean that the benefit was significant enough "in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the ... shareholders without being influenced by her overriding personal interest").

**67.** 473 A.2d at 816.

**68.** *Litt v. Wycoff,* C.A. No. 19083–NC, 2003 WL 1794724, at *4 (Del.Ch. Mar. 28, 2003).

**69.** Pls.' Opp'n Br. at 67.

**70.** *Id.*

**71.** *See* Sept. 15, 2006 Dep. of Michael J. Astrue [hereinafter "Astrue Dep."], Ex. 25 at 2 (noting that the board resolution from which Moorhead and Leff dissented was a resolution to reject the $31 Shire offer).

rectors can be held liable for fiduciary breaches.[72] The record, however, demonstrates that Moorhead was no stooge. He helped found Transkaryotic, served as its chairperson for fifteen years, and was an experienced investment professional with extensive board service in the health care industry.[73] Moreover, Moorhead served as a Transkaryotic director for twelve years before Leff joined the board and, at one point, was Leff's supervisor at Warburg.[74] The idea that Moorhead was Leff's stooge has no support in the record and therefore fails to raise a genuine issue of material fact.

*B. Leff*

■ Plaintiffs allege that Leff's loyalties were divided between Transkaryotic and Warburg. Specifically, plaintiffs charge that Leff pushed for a prompt sale of the Company at an unfairly low price because Warburg had tired of its investment and wanted an exit. In a January 6, 2004 presentation on Warburg's biotechnology investments, Transkaryotic was described as a "problem investment." [75] Later, in early May 2004, Leff indicated in an e-mail that he was considering "distribution or sale [of the Transkaryotic stock], and would probably be inclined to do something if the stock price gets back to the high teens." [76] Prior to the negotiations with Shire, Leff had apparently told Astrue that Warburg had "TKT fatigue" and had decided to sell its interest in the Company.[77]

In addition to Warburg's internal documents and Leff's own specific comments, plaintiffs attempt to cite other evidence to show that Leff' s loyalties were conflicted. For example, investment bankers at Goldman Sachs seemed to be aware that Warburg wanted to dispose of its Transkaryotic investment. Handwritten notes on a September 28, 2004 presentation about Transkaryotic note that Warburg was its largest shareholder and suggest that Warburg would possibly offer "irrevocable support in advance of any announcement." [78] Furthermore, Transkaryotic's own bankers, SG Cowen, quickly concluded that Leff supported the sale of the Company.[79] Transkaryotic's other financial advisors, Bank of America Securities, came to the same conclusion.[80] Finally, plaintiffs allege that Leff' s aggressive and stubborn attempts to force the deal through indicate

**72.** *See* Pls.' Opp'n Br. at 67 (citing *ATR–Kim Eng Fin. Corp. v. Araneta*, C.A. No. 489–N, 2006 WL 3783520, at \*19–21 (Del.Ch. Dec. 21, 2006)).

**73.** *See* Nov. 2, 2007 Dep. of Rodman W. Moorhead, III at 18–24, 41–43 [hereinafter "Moorhead Dep."].

**74.** *See id.* at 33–35, 41–42.

**75.** Nov. 19, 2007 Dep. of Jonathan Leff [hereinafter "Leff Dep."], Ex. 18, at 3, 24.

**76.** Leff Dep., Ex. 19.

**77.** Astrue Dep. at 36–37; *see also* Oct. 12, 2006 Dep. of Lydia Villa–Komaroff at 75 [hereinafter "Villa–Komaroff Dep."] (stating that the phrase "TKT Fatigue" was "just so very Jonathan" and it would "not be inconsis-

tent with things he said"). *But see* Villa–Komaroff Dep. at 76 (noting that she did not believe Astrue communicated the "TKT fatigue" comment to her or otherwise communicated that he thought Leff was acting in Warburg's interest rather than TKT's).

**78.** Nov. 8, 2006 Dep. of Suzanne Hare, Ex. 2 at TKT_APP_0141818.

**79.** *See* Nov. 15, 2006 Dep. of Declan Quirke, Ex. 5 (e-mail between employees at SG Cowen in which one states that "the biggest shareholder (your boy Leff ... ) wants to sell as does the chairman ... they're driving the process against the CEO ... Leff would sell at the offer (from what i[sic] understand) other board members aren't talking like that").

**80.** *See* Oct. 9, 2006 Dep. of Matthew Miller at 34.

that his loyalties were divided. In support, plaintiffs highlight Leff's micromanagement of the valuation process,[81] Leff's apparent change of position on the Zuma Transaction,[82] Leff's response to the Phase III I2S results,[83] and Leff's lobbying for shareholder votes to approve the merger after it was announced.[84]

Leff, however, argues that plaintiffs' contentions make no sense, and he is generally correct for three reasons. First, Warburg was Transkaryotic's largest shareholder and, therefore, stood to suffer the most from any sale of the Company at an unfairly low price. Clearly, the mere fact that Leff was affiliated with a large stockholder does not disable the business judgment rule.[85] On the contrary, in fact, "[a] director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders."[86] Warburg owned about fifteen percent of

Transkaryotic, and this substantial stake gave Leff "powerful economic (and psychological) incentives to get the best available deal."[87] Plaintiffs have failed to show that this normal presumption[88] is inapplicable here because they have not and cannot on this record make "a strong factual showing" that Leff and Warburg "were willing to leave a substantial sum of money on the table ... simply to rid themselves of [Transkaryotic]."[89]

■■■■■■ Indeed, secondly and more importantly, the record simply does not support plaintiffs' position, and plaintiffs have misrepresented and mischaracterized the record in their opposition brief. To begin, plaintiffs have not shown any evidence supporting their contention either that Warburg needed to divest itself of its Transkaryotic shares or that Warburg had definitively decided to do so. Plaintiffs speculate that Warburg wanted to liquidate its Transkaryotic holdings in order to finance a new fund, but they offer no evidence in support of this theory. More-

81. Leff strenuously disagreed with the $39 per share valuation analysis prepared by Chestnut Partners, arguing that it was far too high because it did not use a proper discount rate and relied on overly optimistic projections from management. *See, e.g.,* Oct. 24, 2006 Dep. of Gregory Perry at 103–05.

82. Plaintiffs allege that Leff reached an agreement with Langer to support the Zuma Transaction in return for Langer's support of the Shire deal.

83. *See* Dec. 14, 2006 Dep. of Walter Gilbert, Ex. 5 at TKT_APP_0502620 (e-mail from Leff stating that "it is exceedingly unlikely that Sparta or anyone else will enter into an acquisition agreement unless they are confident that the deal can be closed prior to Hunter's data becoming available").

84. *See* Pls.' Opp'n Br. at 53–59.

85. *See Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 958 (Del.1985).

86. *Orman v. Cullman,* 794 A.2d 5, 26 n. 56 (Del.Ch.2002).

87. *In re Mobile Commc'ns Corp. of Am., Inc. Consol. Litig.,* C.A. Nos. 10627, 10638, 10644, 10656, and 10697, 1991 WL 1392, at *9 (Del. Ch. Jan. 7, 1991), *aff'd,* 608 A.2d 729 (Del. 1992).

88. *See, e.g., Katell v. Morgan Stanley Group, Inc.,* C.A. No. 12343, 1995 WL 376952, at *12 (Del.Ch. Jan. 7, 1995) ("Delaware law presumes that investors act to maximize the value of their own investments."); *cf. Unitrin v. Am. Gen. Corp.,* 651 A.2d 1361, 1380–81 (Del. 1995) ("stockholders are presumed to act in their own best economic interests when they vote in a proxy contest").

89. *McGowan v. Ferro,* 859 A.2d 1012, 1035 (Del.Ch.2004), *aff'd,* 873 A.2d 1099 (Del. 2005).

over, plaintiffs' contention that Warburg had affirmatively decided to rid itself of Transkaryotic is the stuff of fiction; the evidence plaintiffs cite in support belies their argument. At most, the record shows that Warburg had some concerns about its Transkaryotic investment and was continually evaluating it. Such continuous evaluation, however, is what private equity funds are supposed to do. The mere fact that Astrue says Leff once claimed to suffer from "TKT fatigue" cannot create a genuine issue of material fact, especially where other deposition testimony suggests otherwise.[90] Furthermore, the other evidence on which plaintiffs rely to support their contention that Warburg was eager to sell—documents and e-mails from bankers at Goldman Sachs, SG Cowen, and Bank of America—is inadmissible hearsay, which this Court cannot consider on a motion for summary judgment.[91] Those statements are all offered for the truth of the matter they assert—*i.e.*, that Leff and Warburg were eager to sell—and they were all made out of court. Thus, they are hearsay under Rule 801(c) of the Delaware Rules of Evidence, and plaintiffs have made no effort whatsoever to find an exception permitting their admissibility. With no record evidence of Warburg's supposed need to liquidate in order to start a new fund and no admissible evidence demonstrating that Warburg was determined to divest its TKT holdings, plaintiffs are left with what they characterize as Leff's vote "in favor" of accepting Shire's $31 per share price.[92] Because, plaintiffs reason, Leff knew Shire would come back with a better price, this vote offers "the most obvious evidence of the Warburg Directors' true motivation." [93] As discussed above in relation to Moorhead, however, undercutting this reasoning is the fact that *Leff never voted in favor of accepting this inferior bid.* Instead, he, like Moorhead, simply dissented from a board resolution formally rejecting the $31 per share offer. Plaintiffs' sloppy and disingenuous description of the record cannot create a genuine issue of material fact where none exists.

Finally, many of Leff's actions are just as likely evidence of his diligence as they are of disloyalty. Plaintiffs blast Leff for his aggressive questioning of the Chestnut Partners valuation, for objecting to the release of I2S data before the announcement of a deal, and for his efforts to solicit shareholder support for the board-approved merger agreement. Plaintiffs argue that Leff was all too eager to force this bad deal to close. The problem with plaintiffs' argument, however, is that it rests on the assumption that the deal was bad and Leff knew it was bad; there is nothing inherently wrong with eager, engaged, and involved directors. On the contrary, the law requires and encourages director involvement.[94] For example, al-

90. *See, e.g.,* Moorhead Dep. at 94–96, 148–49 (noting that Warburg never ranked its Transkaryotic investment as a candidate for divestment before the announcement of the Shire merger). The internal Warburg documents likewise do not support plaintiffs' position. *See, e.g.,* Leff Dep., Ex. 22 at LEFF 014707, LEFF 014711, LEFF 014715 (internal Warburg documents ranking the Transkaryotic investment in 2004 and 2005 and never recommending divestment).

91. *Henry v. Nanticoke Surgical Assocs., P.A.,* 931 A.2d 460, 462 (Del.Super.2007) ("The Court should not consider inadmissible hear-

say when deciding a Motion for Summary Judgment.").

92. Pls.' Opp'n Br. at 2 ("Leff and Moorhead voted to accept an earlier $31 offer from Shire even though they were specifically advised that Shire was willing to offer more....").

93. *Id.* at 65.

94. *See, e.g.,* 8 *Del. C.* § 141(a); *Hollinger Inc. v. Hollinger Int'l, Inc.,* 858 A.2d 342, 374 (Del.Ch.2004) ("[T]he director-centered na-

though plaintiffs contend that Leff pushed too antagonistically with respect to the Chestnut Partners' valuation, directors like Leff "have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them."[95] Moreover, Albert Holman of Chestnut Partners testified in his deposition that Leff "was very professional in his approach" and that Leff asked "good[,] professional questions."[96] Similarly, plaintiffs' allegations that Leff inequitably solicited "empty votes"[97] are unsupported in the record. First, the very concept of "empty votes" is perhaps rhetorically appealing but legally unavailing; Delaware law explicitly provides for record-date voting.[98] Plaintiffs—a group of sophisticated

investment funds—knowingly purchased the vast bulk of their shares *after* the record date as a merger arbitrage opportunity.[99] Furthermore, Leff's promotion of the board-approved merger agreement is consistent with—rather than at odds with—his fiduciary duties.[100] Finally, plaintiffs' suggestion that Leff coerced certain record-date holders to vote in favor of the deal by exploiting the influence of Warburg is unsupported by the record.[101]

In sum, plaintiffs can ably point to evidence that Leff was an employee of Warburg, that Warburg had some concerns about its investment in Transkaryotic, that Leff was very engaged in the merger negotiations, and that Leff was ultimately a

---

ture of our law [ ... ] leaves directors with wide managerial freedom subject to the strictures of equity, including entire fairness review of interested transactions. It is through this centralized management that stockholder wealth is largely created, or so much thinking goes."); *cf.*, Stephen M. Bainbridge, *Director Primacy: The Means and Ends of Corporate Governance*, 97 NW. U.L. REV. 547, 605 (2003) (concluding that "the board of directors is not a mere agent of the shareholders, but rather is a sort of Platonic guardian serving as the nexus of the various contracts making up the corporation.").

**95.** *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

**96.** Oct. 4, 2006 Dep. of Albert Holman at 152, 155.

**97.** *See* Pls.' Opp'n Br. at 53–59.

**98.** 8 *Del. C.* § 213; *cf. JANA Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 344, 2008 WL 2998684, at *6 (Del.Ch.2008) ("CNET is correct that it has no other advance notice provision and that if the Notice Bylaw is interpreted to apply only to 14a–8 proposals, then 'any of CNET's thousands of stockholders are free to raise for the first time and present any proposals they desire at the Annual Meeting.' Although this may sound daunting, it is the default rule in Delaware." (footnotes omitted)), *aff'd sub nom. CNet Net-*

*works, Inc. v. Jana Master Fund, Ltd.*, 947 A.2d 1120, 2008 WL 2031337 (Del.2008).

**99.** *See* Jan. 7, 2008 Transmittal Aff. of Matthew F. Davis in Support of Opening Br. of Defs. Jonathan S. Leff and Rodman W. Moorhead, Ex. 95, at 5–9 (petitioner's answer to interrogatory about share ownership).

**100.** *See, e.g., Mercier v. Inter–Tel (Del.), Inc.*, 929 A.2d 786, 819 (Del.Ch.2007) ("Stockholders invest to make moolah, cash, ching, green, scratch, cabbage, benjamins—to obtain that which Americans have more words for than Eskimos have for snow—money. When directors act for the purpose of preserving what the directors believe in good faith to be a value-maximizing offer, they act for a compelling reason in the corporate context."); *In re MONY Group, Inc. S'holder Litig.*, 853 A.2d 661, 675–76 (Del.Ch.2004) ("[O]nce a board of directors deems a merger agreement favorable, it may employ various legal powers to achieve a favorable outcome on a shareholder vote required to approve that agreement.").

**101.** *Cf. Hewlett v. Hewlett–Packard Co.*, C.A. No. 19513–NC, 2002 WL 818091, at *15 (Del. Ch. Apr. 30, 2002) (finding no improper influencing of votes even where the chairwoman promoted a merger to shareholders by saying, "This is obviously of great importance to us as a company. *It is of great importance to our ongoing relationship* ").

very enthusiastic salesman for the merger. This evidence does not add up to a breach of the fiduciary duty of loyalty, and it does not reveal a genuine issue of material fact. Consequently, plaintiffs cannot stave off Leff's motion for summary judgment on this claim.

### C. Yetter

 Plaintiffs' claim that Yetter breached his fiduciary duty of loyalty is based on two aspects: (1) Yetter's relationship with Emmens, the CEO of Shire, and (2) Yetter's position as a director with Noven, a company that received a significant amount of income from Shire. The record evidence, however, neither supports plaintiffs' contentions that Yetter has somehow breached his fiduciary duties nor raises a genuine issue of material fact.

 First, the evidence of Yetter's relationship with Emmens does not indicate a conflict of loyalty. Even in the context of a friendship that a plaintiff alleges amounts to an "extraneous consideration," the Supreme Court has noted that the "relationship must be of a bias-producing nature." [102] Specifically, the Court refused to find that independence was compromised even when the two individuals in question "moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends'...." [103] Moreover, this Court has also explicitly recognized that "personal friendships, without more[, and] outside business relationships, without more, are each insufficient to raise a reasonable doubt regarding a director's independence." [104] The relationship between Yetter and Emmens does not rise to even this level, and plaintiffs have not offered evidence that Yetter was somehow interested in or poised to receive a special benefit from the Shire deal. [105]

Second, plaintiffs' attempt to show Yetter's dependence on Emmens for employment is unavailing. Plaintiffs allege that Yetter "was relying on Emmens's reference for a job at the time of Emmens's October 2004 approach." [106] The actual record evidence, however, shows that Yetter merely included Emmens's name on a list of references submitted in connection with an application for a position with Odyssey Pharmaceuticals. [107] There is no evidence that Emmens was actually contacted by Odyssey or any affiliate. In fact, there is no evidence whatsoever that Emmens even knew he was listed as a reference. Moreover, the suggestion that Yetter would sell his vote for a positive job reference is belied by the fact that Yetter—unlike Leff and Moorhead—voted affirmatively to reject the initial Shire offer of $31 per share. [108] At the time of that vote,

---

102. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del.2004).

103. *Id.* at 1051.

104. *In re CompuCom Sys., Inc. Stockholders Litig.*, C.A. No. 499–N, 2005 WL 2481325, at *9 (Del.Ch. Sept. 29, 2005) (quoting *Cal. Pub. Employees' Ret. Sys. v. Coulter*, C.A. No. 19191, 2002 WL 31888343, at *9 (Del.Ch. Dec. 18, 2002)).

105. *Cf. Benihana of Tokyo v. Benihana, Inc.*, 891 A.2d 150, 178–79 (Del.Ch.2005) (concluding that evidence of a close friendship of 40–45 years would not destroy a director's independence, particularly where the director was not interested in the transaction being challenged).

106. Pls.' Opp'n Br. at 69.

107. *See* Nov. 27, 2007 Dep. of Wayne Yetter at 544; *see also* Pls.' Opp'n Br., Ex. 162 (containing the actual reference list).

108. *See* Astrue Dep., Ex. 25 at 2.

February 26, 2005, Yetter had already listed and was, according to plaintiffs, already relying on Emmens's reference. If indeed Yetter had sold his vote, it would have presumably been sold by then.

Third, plaintiffs' quest to link Yetter to Shire via his directorship with Noven is a nonstarter. In 2003, Noven and Shire entered a contractual arrangement pursuant to which Shire paid Noven to acquire sales and marketing rights of a Noven product. From this, plaintiffs conclude that Shire indirectly provided Yetter with financial benefits that somehow made him beholden to Shire. Aside from the fact that this is chronologically nonsensical—the Shire payment to Noven occurred long before Shire made its offer to Transkaryotic—the law is clear that outside business ties to an acquirer and interlocking directorships, without more, are insufficient to prove disloyalty.[109]

Finally, plaintiffs' arguments that Yetter's aggressive actions promoting the Shire deal constitute evidence of disloyalty fail for the same reasons their similar arguments with respect to Leff's actions fail. This Court will not assume that engaged and active directors have bad, disloyal motives. To do so would create a perverse and counterproductive incentive for directors to appear fatigued with respect to any potential deal, lest they later be accused—as Moorhead, Leff, and Yetter are

here—of being overeager. Instead of pointing to "specific facts supportive of their claim, [plaintiffs] offer only unsupported allegations and inferences. That is insufficient to defeat summary judgment."[110]

## V. AIDING AND ABETTING

Plaintiffs allege in Count IV that Shire "knowingly assisted" the Individual Defendants and Langer in breaching their duties of loyalty and disclosure. To establish a claim for aiding and abetting a breach of fiduciary duty, plaintiffs must demonstrate (1) the existence of a fiduciary relationship; (2) a breach of a fiduciary duty; (3) knowing participation in the breach by a defendant who is not a fiduciary; and (4) damages proximately caused by the breach.[111] For the reasons described below, I deny Shire's motion for summary judgment with respect to Langer's purported breach of fiduciary duty and grant its motion with respect to Moorhead, Leff, and Yetter. I also grant Shire's motion for summary judgment with respect to the claim that it aided and abetted the Individual Defendants' alleged breach of disclosure.

### A. Aiding and Abetting a Breach of the Duty of Loyalty

Plaintiffs allege that without Shire's purported acts of aiding and abetting the

---

109. *See, e.g., Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del.2004) ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 206 (Del.Ch.2007) (concluding that interlocking directorships is not even a material fact meriting disclosure); *Litt v. Wycoff*, C.A. No. 19083–NC, 2003 WL 1794724, at *4 (Mar. 28, 2003) ("Neither mere personal friendship alone, nor mere outside business relationships alone, are sufficient to raise a reasonable doubt regarding a director's independence." (footnotes omitted)).

110. *In re Wheelabrator Techs., Inc. S'holders Litig.*, 663 A.2d 1194, 1200 (Del.Ch.1995).

111. *McGowan v. Ferro*, 859 A.2d 1012, 1041 (Del.Ch.2004), *aff'd*, 873 A.2d 1099 (Del.2005) (TABLE); *see also Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del.2001); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 734 (Del.Ch. 1999).

breaches of fiduciary duty committed by Moorhead, Leff, Yetter, and Langer, the merger would not have been approved by the board or the shareholders. Because I granted summary judgment above in favor of Moorhead, Leff, and Yetter based upon their demonstration that no genuine issue of material fact exists as to whether they were disloyal, I also grant summary judgment to Shire with respect to Moorhead, Leff, and Yetter. Shire cannot aid or abet a breach that does not exist.

 Langer, however, did not move for summary judgment on plaintiffs' breach of duty of loyalty claim. Therefore, because only the aiding and abetting claim with respect to Langer remains, I limit my analysis to only those facts relevant to this claim and, in so doing, I must assume that Langer was disloyal. The effect of this assumption is that I here consider only whether Shire knowingly participated in the assumptive breach of duty of loyalty by Langer and, if so, whether that concerted action proximately caused damage to plaintiffs. For the reasons described below, I conclude that Shire has failed to demonstrate that there is no genuine issue of material fact as to either whether it knowingly assisted in Langer's assumptive breach or whether that breach proximately caused damages. I, therefore, deny Shire's summary judgment motion with respect to the Langer claim.[112]

1. **Knowing Participation by Shire in Langer's Assumptive Breach**

 Knowing participation requires that a third party act with the knowledge that the conduct advocated or assisted constitutes a breach of the board's fiduciary

---

**112.** Defendants argue that the majority of plaintiffs lack standing to bring claims that the individual defendants and Langer breached their fiduciary duties of loyalty because certain plaintiffs did not purchase shares of Transkaryotic stock until after the announcement of the merger, and some did not purchase shares until after the record date for the shareholder vote. Under well established law, shareholder plaintiffs may only challenge alleged breaches of fiduciary duty if they held shares of the corporation at the time of the alleged breach. *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1169 (Del. Ch.2002) ("Indeed, under established Delaware law, a breach of fiduciary duty claim must be based on an actual, existing fiduciary relationship between the plaintiff and the defendants at the time of the alleged breach."). Moreover, in order to state a direct claim—as opposed to a derivative claim on behalf of the corporation—shareholders must demonstrate that *they* suffered the alleged harm and that *they* would receive the benefit of any recovery. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del.2004). Here, the purportedly disloyal conduct (which Shire is alleged to have aided and abetted) occurred at the time Langer cast his vote in favor of the merger that benefitted him, not TKT. Therefore, only a plaintiff who held TKT stock as of the date of the board's vote—April 21, 2005—has standing to pursue the aiding and abetting claim against Shire in the inducement of Langer's assumptive breach. Only plaintiff Porter Orlin LLC indisputably has standing to assert the aiding and abetting claim against Shire with respect to Langer by virtue of its having a long position in the Company as of the April 21, 2005 Board vote. Plaintiff Millenco LLC had a position in the Company as of that date, but the parties dispute the nature of that position. To the extent Millenco did indeed hold a gross long position, as it contends, it would seemingly also have standing to assert this claim. *See Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, No. 379–N, 2005 WL 1713067, at * 1–2 (Del.Ch. July 13, 2005). Mindful both that discovery is now complete and that there is at least one other undisputed member who has standing to assert this claim, the Court does not believe that defendants will be prejudiced by allowing Millenco to attempt to correct its technical deficiencies by submitting a more detailed and compliant affidavit than the one it has already submitted, which defendants argue was both insufficient and offered too late. At trial, the Court may give more consideration to the applicability of *Deephaven* to Millenco.

duty.[113] Therefore, a claim that a non-fiduciary aided and abetted a breach of the duty of loyalty by offering a fiduciary a side deal can survive summary judgment only if the record supports a rational inference that the non-fiduciary offered the side deal in order to induce the fiduciary to breach or ignore his duty.[114] Under this standard, a bidder may be liable to the shareholder of the target if the bidder attempts to create or exploit conflicts of interest in the target's board.[115]

Shire contends that plaintiffs cannot establish Shire's liability as an aider and abettor because plaintiffs' theory of knowing participation turns on their purportedly unsupported assertions that Shire offered a side deal to Langer to induce him to disregard his obligations as a fiduciary of TKT. Specifically, Shire argues that, at best, plaintiffs offer evidence only that Shire did not object to a potential deal for the Zuma proteins between TKT and Dr. Reddy's before the merger was approved. This, Shire contends, is not direct evidence of Shire's knowing participation and is even insufficient to give rise to such a rational inference. Moreover, Shire had no such affirmative duty to object to the Zuma Transaction and rejects the imposition of such a duty.

Contrary to Shire's contentions, Plaintiffs have succeeded in proffering evidence from which this Court may infer knowing participation by Shire. First, Shire knew of Langer's interest in consummation of the Zuma Transaction during the TKT–Shire merger negotiations, as Emmens testified in his deposition.[116] Second, that Langer appears to have known that Shire, via Emmens, agreed to the Zuma Transaction may be inferred from an e-mail from Emmens to Langer after the TKT–Shire deal was approved by the board. Implicit in that e-mail is the existence of an agreement with respect to the Zuma Transaction: Emmens acknowledged that his June 11, 2005 position "may seem like a 180 degree shift" from his earlier representation of Shire's acquiescence to the transaction.[117] From this evidence, together with the benefit of reasonable inferences in their favor, I find that plaintiffs have demonstrated that a genuine issue of material fact exists as to whether Shire's support for the Zuma Transaction was expressed for the purpose of enticing Langer to vote

---

113. *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del.2001) (internal citations omitted).

114. *Cf. McGowan v. Ferro*, No. 18672–NC, 2002 WL 77712, at *3–4 (Del.Ch. Jan. 11, 2002).

115. *Malpiede*, 780 A.2d at 1097 (internal citations omitted). In addition, it is the general rule that the knowledge of an officer or director of a corporation will be imputed to a corporation to establish aiding and abetting liability. *Teachers' Ret. Sys. of Louisiana v. Aidinoff*, 900 A.2d 654, 671 n. 23 (Del.Ch. 2006) (internal citations omitted).

116. Emmens Dep. at 37:19–24, 38:1–2 (describing his understanding that Langer had made a deal with Mike Astrue that Dr. Reddy's was going to buy the proteins and confirming that Langer had asked Emmens if Emmens "mind[ed] if we went ahead with this transaction while these [TKTShire merger] discussions were going on?").

117. *Id.* at 41:2–7, 42:4–5 ("Although our side was not overtly opposed to the idea during the TKT negotiations, we did not have access to detailed information regarding the projects being considered for outlicense, nor an understanding of how retaining those projects might impact Shire shareholder value in the future.... Therefore, I must apologize for what may seem a 180 degree shift") (quoting a June 11, 2005 e-mail from Emmens to Langer, Bates number SGC 018977, referenced during Emmens's deposition from the transcript because plaintiffs failed to provide the Court with a copy of the deposition exhibit). *See also id.* at 42:9–10 ("I'm not sure because I think he [Langer] asked me in the hall and I said, Yeah that sounds all right.").

in favor of the merger in order to secure a benefit for himself.[118] I therefore conclude that plaintiffs have adequately, if barely, demonstrated Shire's knowing participation in Langer's assumptive breach of his duty of loyalty to the Company.

## 2. Proximate Causation of Damages

Plaintiffs must demonstrate that the damages to them "resulted from the concerted action of the fiduciary and the non-fiduciary."[119] Shire argues that, even if Shire knowingly assisted Langer in breaching his duty of loyalty by improperly inducing him to vote in favor of the merger, plaintiffs cannot prevail because plaintiffs cannot show that but for the purported side deals the merger consideration would have been materially higher.

Plaintiffs counter that, but for Shire's inducement of Langer's disloyal vote, the merger would not have been approved by the board for recommendation to the TKT shareholders. The board recommended the merger for approval by a vote of 5 to 2 after its April 20, 2005 vote. Assuming that Langer's vote was the product of disloyal conduct and thus tainted, the vote would have been 4 to 2 (eliminating Langer's vote on the merger), or even 4 to 3 (if Langer, as a fiduciary of the Company did not think the merger was in the shareholders' best interests). Though it may appear that Langer's assumptive breach (as purportedly aided and abetted by Shire) may

not have had any effect on the result of the board vote, Villa–Kamaroff's deposition testimony arguably belies this conclusion. Though Villa–Kamaroff asserts that she thought the merger represented fair value for the shareholders, she does not disavow that she also knew that, given the sense of the board, approval was a "foregone conclusion, it was no longer theoretical."[120] Villa–Kamaroff later, however, explicitly states that she did not cast her vote so as to avoid a 4 to 3 board recommendation.[121] Given the benefit of reasonable inferences, the Court concludes that plaintiffs have—however weakly—created a genuine issue of material fact as to whether Shire proximately caused plaintiffs damages through its alleged aiding and abetting of Langer's assumptive disloyal conduct. The Court anticipates that plaintiffs will have a steep uphill battle to carry their burden at trial that Langer's purported breach affected the ultimate result of the vote, assuming they can first prove that Langer did in fact breach his duty of loyalty and then that Shire did in fact knowingly induce that breach. Yet, the Court must conclude at this stage that plaintiffs have sufficiently created a triable fact, thereby entitling them to resolution of this question at trial.

### ii. *Aiding and Abetting Disclosure Violations*

As with the impossibility of Shire's aiding or abetting Moorhead, Leff, and Yetter

---

**118.** That the Zuma Transaction was never consummated is wholly irrelevant for this determination. The offer of improper inducement (*i.e.,* Shire's pledged support for a side deal in exchange for a fiduciary's vote) may still give rise to aiding and abetting liability if that inducement results in the breach of a fiduciary's duty, even if, as here, the deal to which the inducement was related (*i.e.,* the Zuma Transaction) is never completed. So long as the side deal is offered to induce a breach (and in fact does induce the breach),

the liability remains the same whether or not the side deal is actually consummated.

**119.** *See, e.g., In re Gen. Motors (Hughes) S'holder Litig.,* No. 20269, 2005 WL 1089021, at *24 (Del.Ch. May 4, 2005), *aff'd,* 897 A.2d 162, 2006 WL 722198 (Del. Mar. 20, 2006) (quoting *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 386 (Del.Ch.1999)).

**120.** Villa–Kamaroff Dep. at 253.

**121.** *Id.* at 255.

with nonexistent breaches of their duty of loyalty, Shire likewise cannot aid or abet a nonactionable disclosure violation. As discussed at length above,[122] there is no redressable underlying breach of duty and, therefore, there can be no aiding and abetting claim. I therefore grant Shire's motion for summary judgment on plaintiffs' aiding and abetting disclosure violations with respect to the Individual Defendants.

## VI. UNLAWFUL MERGER

In Count III, plaintiffs charge that the merger was not approved by shareholders as required by 8 *Del. C.* § 251(c).[123] Defendants Shire and TKT move for summary judgment,[124] contending that the certificate of merger, the certified report and certificate of inspector of elections, and the proxy ballot conclusively support their contention that they are entitled to judgment as a matter of law with respect to Count III.[125] With respect to the presumption of validity this evidence affords to Transkaryotic, I conclude that plaintiffs have sufficiently, albeit scarcely, rebutted this presumption to survive the Company's motion for summary judgment on the unlawful merger claim of Count III.

Relying on 8 *Del. C.* § 105, the Company contends that the certificate of merger filed with the Secretary of State consti-

---

**122.** *See Section III Disclosure* of this Opinion.

**123.** Section 251(c) requires that, at the annual or special meeting, the "agreement shall be considered and a vote taken for its adoption or rejection. If a majority of the outstanding stock of the corporation entitled to vote thereon shall be voted for adoption of the agreement, that fact shall be certified on the agreement by the secretary or assistant secretary of the corporation. If the agreement shall be so adopted and certified by each constituent corporation, it shall then be filed and shall become effective, in accordance with § 103 of this title." 8 *Del. C.* § 251(c).

**124.** The Court construes Count III as asserted against only TKT (or, more accurately, its surviving entity) because a vote tabulation claim that fails to allege any wrongdoing (much less any action at all) on the part of the individual defendants can only be asserted against the Company. Therefore, though neither Moorhead nor Leff moved for summary judgment and even though Yetter did so move (and was joined in that motion by Langer), no Individual Defendant or Langer was alleged to have engaged in any wrongdoing, whether innocent or deliberate. Under the terms of the merger agreement, Transkaryotic was the surviving corporation in the merger and, thereafter, filed a certificate of amendment under 8 *Del. C.* § 242(a)(1) with the Delaware Secretary of State, changing its legal name to Shire Human Genetic Therapies, Inc. Opening Br. of Defs. Transkaryotic Therapies, Inc. and Shire plc. at 11 n. 11. Therefore, to the extent that there exists any ambiguity about the party or parties against whom this claim is asserted, the Court—in denying Shire and TKT's joint motion for summary judgment on Count III—clarifies that this claim proceeds only against the surviving TKT entity: Shire Human Genetic Therapies, Inc., which, for purposes of resolving this motion, I refer to as "Transkaryotic," "the Company," or "TKT."

**125.** Defendant TKT also challenges plaintiffs' ability to bring a claim challenging the vote by which the merger was approved, arguing that plaintiffs have delayed too long. Though both this Court and the Supreme Court have before had the opportunity to find, as a matter of law, that the passage of thirty-seven years is too long a delay such that no challenge to a corporate election may be raised after that time, neither court has done so. *See Oberly v. Kirby*, 592 A.2d 445, 457 (Del. 1991). Instead, the Delaware Supreme Court defined the demanding standard that such a challenge would have to satisfy, stating that "[b]efore a court declares invalid a corporate election that was held thirty-seven year ago and thereby upsets long-settled expectations and reliance upon assumed events, it is entitled to demand clear and convincing evidence that the election was, in fact, invalid." *Id.* Though plaintiffs here challenge a merger vote, not an election, this case suggests that plaintiffs' delay may not bar plaintiffs from bringing this claim, but instead operates to require that plaintiffs satisfy a similarly onerous burden of proof.

tutes *prima facie* evidence that TKT shareholders voted to approve the merger. This, of course, is undisputable as section 105 specifically provides, in relevant part:

A copy of ... any other certificate which has been filed in the office of the Secretary of State as required by any provision of this title *shall*, when duly certified by the Secretary of State, be received in all courts ... as prima facie evidence of: (1) Due execution, acknowledge and filing of the instrument; (2) Observance and performance of all acts and conditions necessary to have been observed and performed precedent to the instrument becoming effective; and (3) Any other facts required or permitted by law to be stated in the instrument.[126]

In addition, the report of the inspector is presumed to be correct.[127] Plaintiffs contend that the facts support a presumption exactly opposite to that the statutory language unambiguously provides. In their complaint and brief, plaintiffs argue that they should be afforded the presumption

that, despite the duly filed certificate of merger, Transkaryotic *failed* to obtain the necessary vote. Finding no basis whatsoever to turn the statutory presumption commanded by section 105 on its head, I decline to follow plaintiffs' suggestion. In doing so, I also note that on their motion for summary judgment the Company bears the burden to demonstrate that there is no genuine issue of material fact. Therefore, at this stage of the proceedings, plaintiffs need not show that TKT *actually* failed to obtain the requisite vote required by 8 *Del. C.* § 251; plaintiffs need only demonstrate that there is a genuine issue of material fact as to whether TKT actually obtained a sufficient number of votes for the approval of the merger.[128] Plaintiffs must show, not that some unspecified number of votes is at issue, but that a specific number of votes is at issue—namely, the number of votes by which the merger was approved. Here, the merger was approved by a margin of 2.6%, or 929,813 votes.[129] Therefore, to rebut the presump-

---

**126.** 8 *Del. C.* § 105 (emphasis added).

**127.** *Berlin v. Emerald Partners*, 552 A.2d 482, 491 (Del.1988) ("Although the report of the inspectors of election is ministerial, it is presumed to be correct.") (citation omitted).

**128.** *Cf. Coates v. Netro Corp.*, No. 19154, 2002 WL 31112340, *2 (Del.Ch. Sept. 11, 2002) (granting a motion to dismiss where "[n]othing is alleged in the complaint to show that any of the proxies were invalid; nor can any inference reasonably be drawn from the mere statement that the existence of invalid proxies is *likely* " and instead plaintiff offered only "unsupported, conclusory allegations" to support his claim that it was "highly unlikely" that the merger was approved by a sufficient number of valid votes) (emphasis in original).

**129.** Opening Br. of Defs. Transkaryotic Therapies, Inc. and Shire plc at 36 n. 40; Reply Br. of Defs. Transkaryotic Therapies, Inc. and Shire plc at 8. The inspector of election determined that 35,624,361 shares of Transkaryotic common stock were outstanding and entitled to vote at the July 27, 2005 special meeting, with each share entitled to one vote. Jan. 3, 2008 Aff. of Norris Richardson [hereinafter "Richardson Aff."], ¶¶ 3, 5. According to the certificate of the inspector of election, a total of 28,2680,399 were present at the meeting either in person (4000 shares) or by proxy (28,676,399 shares). Ex. C to Richardson Aff. (Certificate of Norris Richardson, Inspector of Elections (July 27, 2005)); *see also* Richardson Aff., ¶ 5. The number of votes required to effectuate the merger was 17,-812,181. *See* 8 *Del. C.* § 251(c) (requiring "a majority of the outstanding stock of the corporation entitled to vote thereon" for approval of the merger); *see also* Richardson Aff. ¶ 5; Ex. C to Richardson Aff. (Certificate of Norris Richardson, Inspector of Elections (July 27, 2005)). The report of the inspector of election details the results of the vote: 18,-741,994 shares voted for the merger (4000 in person and 18,737,994 by proxy; 9,890,989 shares voted against the merger (all 9,890,-989 by proxy); and 47,416 shares abstained from voting (all 47,416 by proxy). Ex. B to

tion of validity afforded by the certificate of merger and report of the inspector, plaintiffs must demonstrate that at least the margin of votes by which the merger was approved—*i.e.*, 2.6% or 929,813 votes—can be called into question.

### A. *Plaintiffs' Allegations Create a Genuine Issue of Material Fact*

 In their attempt to demonstrate that such a genuine issue of material fact exists, plaintiffs point to one account at State Street Bank & Trust Co. ("State Street Bank") to support their argument that votes were improperly calculated so as to call into question whether the merger was actually approved. As of the record date, State Street Bank account number 0837/0997 (the "State Street 0837/0997 Account") held 1,553,872 shares. There are two proxy cards purportedly associated with this account that are in dispute. For convenience, I have created Table 1, which highlights the disputed votes and represents the proxies that plaintiffs contend were submitted on behalf of the State Street 0837/0997 Account and counted in favor of the merger.

Table 1: Proxies purportedly submitted for the State Street 0837/0997 Account [130]

| State Street Bank (Account Number 0837/0997) | | | | | Total to Date | | |
|---|---|---|---|---|---|---|---|
| Date | Position | For | Against | Abstain | For | Against | Abstain |
| 7/12/05 | 1553872 | 19752 | 0 | 0 | | | |
| 7/18/05 | 1553872 | 14200 | 0 | 0 | 33952 | 0 | 0 |
| 7/19/05 | 1153872 | 0 | 80271 | 0 | 33952 | 80271 | 0 |
| 7/20/05 | 1153872 | 0 | 554472 | 0 | 33952 | 634743 | 0 |
| 7/21/05 | 1153872 | 0 | 19500 | 0 | 33952 | 654243 | 0 |
| 7/22/05 | 1153872 | 2807 | 4300 | 0 | 36759 | 658543 | 0 |
| *7/25/05* | *(none listed)* | *776395* | *0* | *0* | | | |
| 7/25/08 | 1553872 | 86100 | 0 | 0 | 122859 | 658543 | 0 |
| 7/26/05 | 1553872 | 0 | 100 | 0 | 122859 | 658643 | 0 |
| 7/26/05 | 1553872 | 0 | 51717 | 0 | 122859 | 710360 | 0 |
| *7/27/05* | *1153872* | *1121089* | *-450000* | *0* | *1243948* | *260360* | *0* |
| 7/27/05 | 1553872 | 1121089 | -450000 | 0 | 1243948 | 260360 | 0 |
| Total | | 3141432 | -189640 | 0 | | | |

Plaintiffs contend that Table 1 demonstrates that there exists a genuine issue of material fact as to whether the vote count was accurate. In support of this argument, they point to two separate proxy cards: a July 25 proxy card (with 776,395 votes for the merger) and a July 27 proxy card (with 1,121,089 votes for the merger and negative 450,000 votes against, mean-ing the withdrawal of 450,000 votes that had previously been voted against the merger). According to plaintiffs, these cards clearly demonstrate an over-vote situation because the State Street 0837/0997 Account's total position (and thus, total net votes it was capable of casting in favor of the merger) was 1,553,872, but the proxy cards indicate that up to 3,141,432 votes in

---

Richardson Aff. (Report of Norris Richardson, Inspector of Elections (July 27, 2005)); *see also* Richardson Aff., ¶ 5.

130. Compiled from TKT_APP_0401085–220 at Tab 202 to Pls.' Opp'n Br.; TKT_APP_0401087 and TKT_APP_0401209 at Ex. 2 to McCauley's Supp. Aff.

favor of the merger may have been counted. Plaintiffs therefore allege that the proxy cards were tabulated improperly.[131]

1. *The July 25 Proxy Card Purported To Be Associated With Subaccount Number 2399*

Transkaryotic counters plaintiffs' tabulation of votes attack with a two-part response. First, the Company argues that plaintiffs erroneously included a July 25 proxy card in their vote count and that these 776,395 votes instead should be attributed to a different State Street account. Transkaryotic notes that of the five separate State Street accounts at ADP, three shared the 0837/0997 account number and, of those three, two were further identified by subaccount numbers. The Company then concludes that the 776,395 votes were properly attributed to a subaccount number 2399 of the State Street 0837/0997 Account, though it provides no evidence whatsoever to support this contention.

Having examined the proxy card at issue, I find nothing on the face of the proxy card that would compel the conclusion that these votes are associated with a separate subaccount. Plaintiffs do not dispute the existence of a separate State Street account with a position of 800,000.[132] However possible, if not likely, it seems that the 776,395 votes at issue on the July 25 proxy card are in fact properly associated with State Street subaccount 2399, the Company categorically fails to rebut plaintiffs' proffer of evidence with anything but a conclusory statement.[133] Had Transkaryotic produced some sort of documentation to support its contention, the Court may have been able to determine that plaintiffs' argument about the July 25 proxy card was no more than speculation and therefore was insufficient to create a genuine issue of material fact about these votes. Without such evidence, however, I am forced to conclude that, with respect to the 776,395 votes at issue on the July 25 proxy card, plaintiffs have raised a genuine issue of material fact as to whether these votes were improperly included as votes in favor of the merger.

2. *The Non–Identical July 27 Proxy Cards*

Transkaryotic next argues that plaintiffs mistakenly counted the July 27 proxy card twice. The Company observes that the cards contain identical numbers of votes

---

**131.** In so alleging, plaintiffs appear to challenge the report of the inspector of elections because, they contend, the existence of the disputed proxy cards would, at the very least, have complicated the vote count such that the inspector would have had to take the time to resolve any apparent discrepancy. Leff testified in his deposition that he "recall[ed] that [the meeting] was relatively brief, maybe ten minutes" though this estimation was "just a guess." Leff Dep. at 770:18–23. Because the meeting was brief, plaintiffs argue that the only explanation is that the inspector of elections must have accepted Transkaryotic's vote count without independently verifying the count or making a proper determination as to the votes of this account. The inspector submitted an affidavit attesting to the faithful performance of his duties. *See* Richardson Aff. Neither plaintiffs nor defendants, however, have deposed him to further explore the details of the inspector's performance of his duties or clarify what is otherwise pure conjecture and speculation.

**132.** *See* Pls.' Opp'n Br. at 93 (observing that "State Street held many shares in other accounts ... (almost 800,000 shares in account 2399 alone)").

**133.** Reply Br. of Defs. Transkaryotic Therapies, Inc. and Shire plc at 8 n. 12 (asserting that "the 776,395 votes listed in the eighth column from the left [of plaintiffs' table] are properly attributed to subaccount 2399, which plaintiffs incorrectly claim did not vote at all").

(1,121,089 votes for the merger and a withdrawal of 450,000 votes against) and, tellingly, that the "total to date" count on the cards are identical (with 1,243,948 in favor and 260,360 against). TKT ascribes plaintiffs' inclusion of both July 27 proxy cards to the fact that the same *proxy card* was apparently produced twice.[134]

Even a cursory examination of each card makes clear that the cards are not identical reproductions or photocopies of each other. Among the differences between the two cards are different headings, fonts, and formatting (*e.g.*, one card has additional rows and columns that the other does not), as well as additional text on one card not on the other (*e.g.*, one card includes an explanation of "supplemental proxy" at the bottom of the card). Thus, it is obvious that they are not the same card, even if it might be arguably almost as obvious that the votes represented by each card are the same. The number of "for," "against," and "abstain" votes and the "total to date" vote counts are identical on each card, not only for the State Street 0837/0997 Account, but also for the other three accounts listed on the card. Nevertheless, it is unclear whether two proxy cards (representing the same votes) were produced twice merely in the course of discovery or whether, more worryingly, during the course of vote tabulation for the merger. Neither side has presented me with any information about this point and, on TKT's motion for summary judgment, it is the Company's burden to demonstrate to the Court that no genuine issue of material fact exists. Transkaryotic has failed to explain to the Court why two distinct cards representing the same votes were produced to plaintiffs or why the Court should infer that the

cards were not produced twice during the vote tabulation process. Certainly such credible explanations exist, but the Company fails to offer even one. Having rejected TKT's obviously flawed argument that the two cards are actually one and the same, I must conclude that plaintiffs have raised a genuine issue of material fact with respect to the 1,121,089 votes in favor of the merger and the withdrawal of 450,000 votes against it.

### B. Summary: Denial of TKT's Motion on Count III

In sum, I find that plaintiffs have raised a genuine issue of material fact with respect to as many as 1,897,484 votes in favor of a merger that was approved by 929,813 votes. Plaintiffs, for purposes of summary judgment, have sufficiently rebutted the presumption of validity afforded by the certificate of merger. I hasten to add, however, that this conclusion should not in any way imply that I am optimistic that plaintiffs will succeed in carrying their ultimate burden of proof at trial. Much of plaintiffs' success in surviving TKT's motion for summary judgment is owed to two factors: first, plaintiffs carried a lesser burden as the nonmoving party and had the benefit of reasonable inferences in resolution of this motion; and second, Transkaryotic offered only conclusory assertions in its attempt to diffuse plaintiffs' specific challenges to the vote tabulation process. Though the Court can envision many ways in which the Company could have demonstrated that plaintiffs' allegations did not demonstrate the existence of a genuine issue of material fact, the Company seemed content to rely on the presumptions afforded by statute and case law. Here, such passive reliance on docu-

---

134. *Id.* ("This duplication arises from Plaintiffs' erroneous double-counting of votes reflected in two produced copies *of the same proxy card* reflecting the same votes cast on behalf of the same twelve banks and brokers with the same "Vote to Date" totals.") (emphasis added).

ments that were merely presumptive—not conclusive—evidence of the proper consummation of the merger was insufficient.

Given the peculiar facts and history of this case, the Court must acknowledge its reluctance to allow this claim to continue. Though the Legislature, in creating a statutory procedure in section 225(b) for challenging the vote by which plaintiffs failed to abide, imposed no requirement that plaintiffs must attend the meeting in order to challenge it or that plaintiffs must challenge the vote within a certain period of time, the Court notes that plaintiffs here did not attend the meeting in order to vote, which by their own allegation "was going to be the potential subject of challenge," [135] and also notes that plaintiffs did not bring this claim until nineteen months after the vote. Moreover, the Court is not unaware that allowing this claim to advance beyond TKT's motion for summary judgment implicates important policy concerns regarding the need for finality in corporate transactions.[136] Thus, as with a delayed challenge to an election vote,[137] the Court will demand clear and convincing evidence—not merely raising a genuine issue of material fact with the benefit of all reasonable inferences—that the vote was invalid. Though the Court may be reluctant to permit even the specter of undermining the finality of this merger, which was consummated nearly three years ago,

defendants have failed to demonstrate that plaintiffs have not raised a genuine issue of material fact that requires resolution by a fact-finding at trial.

## VII. CONCLUSION

The evidence plaintiffs have managed to dig up in their multi-year excavation of the TKT–Shire merger has led them to spin a tale of betrayal and self-interest by certain directors and heroics by the CEO. An examination of the actual record evidence, however, demonstrates that there is no genuine issue of material fact with respect to the Individual Defendants' loyalties. Consequently, I grant summary judgment in favor of those defendants on Counts I and II. Having found no breach of duty, then, I also grant summary judgment in favor of Shire with respect to Count IV insofar as it accuses Shire of aiding and abetting breaches by Yetter, Moorhead, and Leff.

Plaintiffs' excavation, however, has unearthed enough questionable artifacts to create a triable issue of fact with respect to one aspect of the aiding and abetting claim, and I therefore deny summary judgment as to the portion of Count IV relating to Langer. Moreover, defendants have failed to demonstrate that there is no genuine issue of material fact with respect to Count III. Although the certificate of

---

135. Compl. ¶ 96. *See also* Pls.' Opp'n to Defs.' Mots. for Summ. J. at 60 (describing reasons why TKT should have preserved its voting and proxy records because, before the closing of the merger, "several large stockholders had publicly questioned the proposed merger; both major shareholder advisory firms (ISS and Glass Lewis) had recommended that the deal be voted down; the proposed merger had been the subject of numerous media reports, including one that focused on potential impropriety by Leff and Warburg"). The Court thinks that, to the extent that these reasons should have signaled to defendants a possible need for careful pres-

ervation of the voting records, such reasons apply with equal force to plaintiffs, who did not attend the meeting at which the merger was approved and who did not challenge the results of the vote pursuant to section 225(b).

136. *See cf. Seidman & Assocs., L.L.C. v. G.A. Fin., Inc.*, 837 A.2d 21, 26 (Del.Ch.2003) ("Delaware law recognizes the need for certainty and finality in corporate elections, in order to avoid prolonged periods of turmoil.").

137. *See* note 125, *supra*.

merger creates a *presumption* of validity, plaintiffs have rebutted that presumption with record evidence. Summary judgment, therefore, is denied as to Count III. The parties should contact chambers to reschedule trial in this matter.

IT IS SO ORDERED.